**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ANDREA ROSNER, Derivatively on Behalf of AMERISOURCEBERGEN CORPORATION,    ) ) ) | Case No. |
|                 Plaintiff,    ) ) | |
|    v.                      ) ) | |
| STEVEN H. COLLIS, JANE E. HENNEY, HENRY W. MCGEE, MICHAEL J. LONG, RICHARD W. GOCHNAUER, KATHLEEN W. HYLE, LON R. GREENBERG, ORNELLA BARRA, D. MARK DURCAN, DOUGLAS R. CONANT, RICHARD C. GOZON, EDWARD E. HAGENLOCKER, and CHARLES H. COTROS,    ) ) ) ) ) ) ) ) ) ) | |
|             Defendants,    ) ) | |
|    -and-               ) ) | |
| AMERISOURCEBERGEN CORPORATION, a Delaware corporation,    ) ) ) | |
|       Nominal Defendant.    ) ) | DEMAND FOR JURY TRIAL |

**[REDACTED] VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources. Additionally, one of the grounds Plaintiff's allegations is her review of books and records produced by AmerisourceBergen

Corporation ("AmerisourceBergen" or the "Company"), all of which are incorporated by reference in this Complaint.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant AmerisourceBergen Corporation ("AmerisourceBergen" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in billions of dollars in damages to AmerisourceBergen's reputation, goodwill, and standing in the business community.   Moreover, these actions have exposed AmerisourceBergen to billions of dollars in potential liability for violations of state and federal law.

2.      AmerisourceBergen is a global pharmaceutical sourcing and distribution services company.  Through its subsidiaries, the Company sells specialty drugs, including opioids.  It is one of the world's largest wholesale distributors of opioid pain medication.

3.      Currently, the United States is experiencing the deadliest drug crisis the country has ever seen.  Over the past two decades, opioid overdoses have killed approximately 315,000 people in the United States, with over 200,000 people dying from prescription opioid overdoses. Millions of Americans struggle with opioid addiction every day.  Congress has attempted to allay the damage by passing strict drug laws and regulations designed to prevent the diversion[1] of controlled substances into the illicit market and ensure the safe distribution of opioids.  Virtually every state has enacted their own form of these laws.  Nonetheless, the opioid epidemic has continued to rise, as companies such as AmerisourceBergen expanded the opioid market by

---

[1] Diversion occurs when controlled substance transactions fall outside the closed system of distribution, or out of appropriate medical channels and into the illicit drug market.

increasing the distribution of prescription opioid drugs. The increased volume of opioid distribution correlated directly to skyrocketing addiction, overdose, and death. The President has declared the opioid crisis a public health emergency.

4. Under federal and state laws, AmerisourceBergen has specific duties to identify, halt, and report suspicious orders of controlled substances. The Company, however, has consciously failed in its duties. Faced with extremely suspicious orders, AmerisourceBergen repeatedly filled them instead of reporting them to the proper authorities. AmerisourceBergen chose to fill these facially suspicious orders, accounting for such large quantities of prescription drugs, or made so frequently, that there could be no associated legitimate medical purpose. Furthermore, over the last twenty years, AmerisourceBergen continued the practice of shipping orders it identified as suspicious, with little or no documentation as to whether a due diligence investigation was conducted on its customers.

5. The Company's failures were made possible by AmerisourceBergen's knowingly deficient programs for controlling or monitoring the diversion of controlled substances into illicit channels. In particular, AmerisourceBergen was repeatedly warned by government agencies that its internal controls were not in compliance. Yet, the Company failed to take steps to cure the deficiencies. This conscious failure to adequately monitor and report suspicious orders has directly contributed to the widespread opioid epidemic, all while AmerisourceBergen has grown to be one of the world's largest suppliers of opioid drugs.

6. During this time, AmerisourceBergen's Board of Directors (the "Board") obtained crucial information that informed them of the Company's non-compliance with the controlled substances laws. One such alert was the settlement agreement AmerisourceBergen entered into with the U.S. Drug Enforcement Administration ("DEA") in June 2007. In 2007, the DEA

suspended the Company's license to send controlled substances from one of its distribution centers in Orlando, Florida.  The DEA explained that the Company failed to maintain effective internal controls over shipments of prescription opioids, leading to diversion of millions of dosage units of its drugs.  As the DEA stated at the time, "continued registration of this company constitutes an imminent danger to public health and safety."  To settle the charges, AmerisourceBergen agreed to implement an enhanced order monitoring program in all of its distribution centers in an effort to improve its failing anti-diversion controls.  This program was critical to the Company's ability to maintain regulatory compliance and continue to operate as a drug distributor. ███████

████████████████████████████████████████████████████

████████████████████████

7.    ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████  ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

8.    The public took notice of the suffocating death toll, and large distribution companies such as AmerisourceBergen came under intense scrutiny.  Beginning in 2012, federal and state prosecutors started investigating the Company over concerns with its ineffective anti-diversion programs.  U.S. Attorney's Offices for Colorado, Florida, Kansas, Michigan, New Jersey, New York, Ohio, and West Virginia each issued subpoenas requesting documents to investigate

the Company's diversion control and order monitoring programs.  Congress began its own investigation, even calling for the Company's Chief Executive Officer ("CEO"), defendant Steven H. Collis ("Collis") to testify before the House Energy and Commerce Committee.  In addition, the Attorney General of the state of West Virginia filed a lawsuit in 2012 against AmerisourceBergen alleging the Company knowingly violated controlled substances laws in the state.

9.      Nearly a decade after its settlement with the DEA, AmerisourceBergen once again settled charges over its unlawful distribution practices.  The Company settled the state of West Virginia's allegations in January 2017 for $16 million and an agreement to adhere to stricter reporting guidelines.  Yet, the same ineffective oversight continued.

10.     As a direct result of this unlawful course of conduct, AmerisourceBergen is now the subject of a flood of lawsuits filed on behalf of those who have suffered harm from the Company's opioid distribution scheme.  Over two thousand cities, counties, municipalities, tribal authorities, and virtually every state's Attorneys General have alleged that drug companies, including AmerisourceBergen, fueled the nation's opioid crisis to line their own pockets at the expense of the American public.  AmerisourceBergen already has spent more than $1 billion in connection with the opioid-related lawsuits and investigations.  The Company and other distributor defendants have proposed $10 billion to settle the state claims, and the state regulators countered at $45 billion.  Furthermore, the federal opioid cases have been consolidated for multi-district litigation ("MDL") in the U.S. District Court for the Northern District of Ohio and continue to advance to trial.  Recently, AmerisourceBergen, along with other wholesale distributors and manufacturers, agreed to pay $215 million to two Ohio counties to avoid the first federal opioid

trial scheduled to begin in connection with the MDL (the "bellwether trials").  Analysts have estimated that a global settlement could cost the wrongdoers as much as $100 billion.

11.     Notwithstanding the Company's unlawful and indifferent drug distribution practices, on January 19, 2018, certain of the Individual Defendants (as defined herein) negligently issued a false and misleading Proxy Statement on Form DEF 14A (the "2018 Proxy") urging stockholders to reelect certain directors and to reject two stockholder proposals that proposed improved internal controls due to AmerisourceBergen's contribution to the opioid epidemic.  In support of its bid, the 2018 Proxy assured AmerisourceBergen stockholders that the Board acted in accordance with the Company's Code of Ethics and Business Conduct and Corporate Governance Principles, and "actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse."  In truth, the Board utterly failed in its duties of oversight by allowing the Company to engage in unlawful opioid distribution and failed to adequately address its insufficient internal controls.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) AmerisourceBergen maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AmerisourceBergen, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Andrea Rosner was a stockholder of AmerisourceBergen at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current AmerisourceBergen stockholder.

**Nominal Defendant**

16.     Nominal defendant AmerisourceBergen is a Delaware corporation with principal executive offices located at 1300 Morris Drive, Chesterbrook, Pennsylvania.  AmerisourceBergen is a pharmaceutical sourcing and distribution services company.  The Company distributes pharmaceuticals, over-the-counter healthcare products, home healthcare supplies and equipment, outsourced compounded sterile preparations, and related services to a wide variety of healthcare providers located in the United States and select global markets.  As of September 30, 2019, the Company had approximately 22,000 employees.

**Defendants**

17.     Defendant Collis is AmerisourceBergen's Chairman of the Board and has been since March 2016; President and Chief Executive Officer and has been since July 2011; and a director and has been since May 2011.  Defendant Collis was also AmerisourceBergen's President and Chief Operating Officer from November 2010 to July 2011; Executive Vice President and President, AmerisourceBergen Drug Corporation from September 2009 to November 2010; Executive Vice President and President, AmerisourceBergen Specialty Group from September 2007 to September 2009; Senior Vice President and President, AmerisourceBergen Specialty Group from August 2001 to September 2007; and has held various other positions of increasing responsibility at the Company, its predecessors, and its subsidiaries since 1994.  Defendant Collis knowingly, recklessly, or with gross negligence allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant Collis the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $1,240,000 | $5,599,992 | $2,400,007 | $2,050,733 | $223,383 | $11,514,115 |
| 2017 | $1,240,000 | $4,199,984 | $2,799,999 | $1,339,883 | $327,408 | $9,907,274 |
| 2016 | $1,234,231 | $4,019,981 | $2,680,003 | $1,330,783 | $713,178 | $9,978,176 |
| 2015 | $1,190,000 | $4,019,982 | $2,679,998 | $2,447,342 | $463,504 | $10,800,826 |
| 2014 | $1,185,962 | $4,020,021 | $2,679,998 | $1,859,697 | $157,307 | $9,902,985 |
| 2013 | $1,155,000 | $7,710,338 | $1,675,899 | $1,314,978 | $143,991 | $12,000,206 |
| 2012 | $1,093,462 | $2,699,983 | $1,800,015 | $1,348,150 | $115,012 | $7,056,622 |

18.     Defendant Jane E. Henney ("Henney") is AmerisourceBergen's Lead Independent Director and has been since March 2016, and a director and has been since January 2002. Defendant Henney has served ex officio on the Company's Audit Committee since at least March

2017.  Defendant Henney was also the Chair of the Governance and Nominating Committee from at least January 2012 to at least January 2017, and served ex officio on that committee from at least January 2018 to at least January 2019.  Defendant Henney knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant Henney the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $150,026 | $5,017 | $280,043 |
| 2017 | $130,000 | $149,954 | $6,763 | $286,717 |
| 2016 | $124,583 | $150,000 | $8,474 | $283,057 |
| 2015 | $110,000 | $125,000 | $21,461 | $256,461 |
| 2014 | $110,000 | $125,000 | $24,485 | $259,485 |
| 2013 | $110,000 | $125,000 | $12,289 | $247,289 |
| 2012 | $91,500 | $137,500 | $11,789 | $240,789 |

19.     Defendant Henry W. McGee ("McGee") is an AmerisourceBergen director and has been since November 2004.  Defendant McGee is the Chair of the Company's Governance and Nominating Committee and has been since at least January 2018; a member of that committee and has been since at least January 2012; and was also a member of the Audit Committee from at least January 2012 to at least January 2015.  Defendant McGee knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant McGee the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $110,000 | $125,022 | $25,441 | $260,463 |
| 2017 | $105,000 | $125,038 | $17,933 | $247,971 |
| 2016 | $100,000 | $125,000 | $20,336 | $245,336 |
| 2015 | $100,000 | $125,000 | $4,945 | $229,945 |
| 2014 | $100,000 | $125,000 | $5,289 | $230,289 |
| 2013 | $100,000 | $125,000 | $11,912 | $236,912 |
| 2012 | $84,000 | $137,500 | - | $221,500 |

20.    Defendant Michael J. Long ("Long") is an AmerisourceBergen director and has been since May 2006.  Defendant Long is a member of the Company's Governance and Nominating Committee and has been since at least January 2019; and was also a member of the Audit Committee from at least January 2012 to at least January 2018.  Defendant Long knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant Long the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $115,024 | $125,022 | $5,017 | $245,063 |
| 2017 | $115,072 | $125,038 | $6,763 | $246,873 |
| 2016 | $115,000 | $125,000 | $8,474 | $248,474 |
| 2015 | $115,000 | $125,000 | $9,497 | $249,497 |
| 2014 | $115,000 | $125,000 | $4,040 | $244,040 |
| 2013 | $108,750 | $125,000 | $3,938 | $237,688 |
| 2012 | $9,000 | $212,500 | $4,561 | $226,061 |

21.    Defendant Richard W. Gochnauer ("Gochnauer") is an AmerisourceBergen director and has been since September 2008.  Defendant Gochnauer was a member of the Company's Governance and Nominating Committee from at least January 2012 to at least January 2018; and a member of the Audit Committee from at least January 2012 to at least January 2013.  Defendant Gochnauer knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant Gochnauer the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $110,000 | $125,022 | - | $235,022 |
| 2017 | $110,000 | $125,038 | - | $235,038 |
| 2016 | $110,000 | $125,000 | $8,474 | $243,474 |
| 2015 | $105,000 | $125,000 | $9,497 | $239,497 |

| | | | | |
|---|---|---|---|---|
| 2014 | $100,000 | $125,000 | $4,040 | $229,040 |
| 2013 | $100,000 | $125,000 | $3,938 | $228,938 |
| 2012 | $85,500 | $137,500 | $3,987 | $226,987 |

22.    Defendant Kathleen W. Hyle ("Hyle") is an AmerisourceBergen director and has been since May 2010.  Defendant Hyle is a member of the Company's Compliance and Risk Committee and has been since December 2019.  Defendant Hyle was also a member of the Company's Audit Committee from at least January 2012 to at least January 2018, and was the Chair of that committee from at least January 2012 to at least January 2017.  Defendant Hyle knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability. AmerisourceBergen paid defendant Hyle the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $100,000 | $125,022 | $5,017 | $230,039 |
| 2017 | $110,000 | $125,038 | $6,763 | $241,801 |
| 2016 | $120,000 | $125,000 | $8,474 | $253,474 |
| 2015 | $120,000 | $125,000 | $9,497 | $254,497 |
| 2014 | $120,000 | $125,000 | $4,040 | $249,040 |
| 2013 | $120,000 | $125,000 | $4,668 | $249,668 |
| 2012 | $61,000 | $182,500 | - | $243,500 |

23.    Defendant Lon R. Greenberg ("Greenberg") is an AmerisourceBergen director and has been since May 2013.  Defendant Greenberg is a member of the Company's Audit Committee and has been since at least January 2014; and the Chair of the Compliance and Risk Committee and has been since December 2019.  Defendant Greenberg was also the Chair of the Company's Audit Committee from at least January 2018 to at least January 2019.  Defendant Greenberg knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability. AmerisourceBergen paid defendant Greenberg the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $120,000 | $125,022 | - | $245,022 |
| 2017 | $110,000 | $125,038 | $6,763 | $241,801 |
| 2016 | $100,000 | $125,000 | - | $225,000 |
| 2015 | $100,000 | $125,000 | - | $225,000 |
| 2014 | $100,000 | $125,000 | - | $225,000 |
| 2013 | $37,637 | - | - | $37,637 |

24.     Defendant Ornella Barra ("Barra") is an AmerisourceBergen director and has been since January 2015.   Defendant Barra is a member of the Company's Compliance and Risk Committee and has been since December 2019.  Defendant Barra knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.

25.     Defendant D. Mark Durcan ("Durcan") is an AmerisourceBergen director and has been since September 2015.  Defendant Durcan is the Chair of the Company's Audit Committee and has been since at least December 2019; and a member of that committee and has been since January 2016.  Defendant Durcan knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.   AmerisourceBergen paid defendant Durcan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2018 | $100,000 | $125,022 | $225,022 |
| 2017 | $100,000 | $125,038 | $225,038 |
| 2016 | $106,250 | $125,000 | $231,250 |
| 2015 | $6,250 | - | $6,250 |

26.     Defendant Douglas R. Conant ("Conant") was an AmerisourceBergen director from January 2013 to February 2019.  Defendant Conant was a member of the Company's Governance and Nominating Committee from at least January 2016 to February 2019.  Defendant Conant knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to

proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability. AmerisourceBergen paid defendant Conant the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $100,000 | $125,022 | $5,017 | $230,039 |
| 2017 | $100,000 | $125,038 | $6,763 | $231,801 |
| 2016 | $100,000 | $125,000 | $8,474 | $233,474 |
| 2015 | $100,000 | $125,000 | - | $225,000 |
| 2014 | $100,000 | $125,000 | - | $225,000 |
| 2013 | $75,000 | $125,000 | - | $200,000 |

27.     Defendant Richard C. Gozon ("Gozon") was AmerisourceBergen's Chairman of the Board from February 2006 to March 2016, and a director from August 2001 to March 2016. Defendant Gozon knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant Gozon the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $75,000 | - | $11,866 | $86,866 |
| 2015 | $150,000 | $175,000 | $25,418 | $350,418 |
| 2014 | $150,000 | $175,000 | - | $325,000 |
| 2013 | $150,000 | $175,000 | - | $325,000 |
| 2012 | $140,250 | $175,000 | - | $315,250 |

28.     Defendant Edward E. Hagenlocker ("Hagenlocker") was an AmerisourceBergen director from August 2001 to September 2015.  Defendant Hagenlocker was a member of the Company's Governance and Nominating Committee from at least January 2012 to at least January 2014.  Defendant Hagenlocker knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to

billions of dollars in liability.  AmerisourceBergen paid defendant Hagenlocker the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2015 | $55,000 | - | $8,780 | $63,780 |
| 2014 | $110,000 | $125,000 | - | $235,000 |
| 2013 | $110,000 | $125,000 | - | $235,000 |
| 2012 | $103,000 | $125,000 | - | $228,000 |

29.     Defendant Charles H. Cotros ("Cotros") was an AmerisourceBergen director from January 2002 to February 2013.  Defendant Cotros knowingly or recklessly allowed the Company to engage in an unlawful scheme designed to proliferate opioid use and abuse, and subjected the Company to billions of dollars in liability.  AmerisourceBergen paid defendant Cotros the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2013 | $47,917 | - | $1,058 | $48,975 |
| 2012 | $97,250 | $137,500 | $20,794 | $255,544 |

30.     The defendant identified in ¶17 is referred to herein as the "Officer Defendants." The defendants identified in ¶¶17-29 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18-23, 25 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶18-21, 26, 28 are referred to herein as the "Governance and Nominating Committee Defendants."  Collectively, the defendants identified in ¶¶17-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe AmerisourceBergen and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost

- 14 -

ability to control and manage AmerisourceBergen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AmerisourceBergen and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the officers and directors of AmerisourceBergen were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AmerisourceBergen were required to, among other things:

(a)     ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements and refrained from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how AmerisourceBergen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

33.     AmerisourceBergen holds its fiduciaries to specific corporate governance principles beyond the requirements of law.  In particular, in the Company's Corporate Governance Principles, AmerisourceBergen described the duties undertaken by the Board and the active oversight role the Board played in the Company's business affairs.  The Corporate Governance

Principles state that the Board must "oversee management and [] assure that the long-term interests of the stockholders are being served."  The Board also has responsibility for assessing major risks facing the Company as well as ensuring processes are in place for maintaining the integrity of the Company.  In particular, the Corporate Governance Principles state:

███████████████████████████████████████████

██████████████████████████████████████

\*   \*   \*

In addition to its general oversight of management, the Board also performs a number of specific functions, including:

\*   \*   \*

c. reviewing, approving and monitoring fundamental financial and business strategies and major corporate actions;

\*   \*   \*

e. assessing major risks facing the Company and reviewing options for their mitigation, including oversight of the Company's policies and procedures for assessing and managing risk; and

f. ensuring processes are in place for maintaining the integrity of the Company – the integrity of the financial statements, the integrity of compliance with law and ethics, the integrity of relationships with customers and suppliers, and the integrity of relationships with shareholders.

34.     The Individual Defendants, as officers and directors of AmerisourceBergen, were also bound by the Company's Code of Ethics and Business Conduct and Code of Ethics for Designated Senior Officers (collectively, the "Code").  The Code sets out basic principles to guide all employees of AmerisourceBergen who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations.  In particular, the Code requires its directors, officers, and employees to "comply with all federal, state and local laws, regulations and rules."

**Additional Duties of the Audit Committee Defendants**

35.     In addition to these duties, under the Audit Committee Charter in effect since October 2003, the Audit Committee Defendants, defendants Henney, Durcan, Greenberg, McGee, Long, Hyle, and Gochnauer, owed specific duties to AmerisourceBergen to assist the Board in overseeing "the Company's compliance with legal and regulatory requirements and performance of the Company's internal audit function and independent auditor."   Moreover, the Audit Committee's Charter in 2015 provides that the Audit Committee must:

> Discuss with management and the independent auditor any correspondence from regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.
>
> *     *     *
>
> Discuss the Company's guidelines, policies and practices with respect to risk assessment and risk management, including financial reporting risks.
>
> *     *     *
>
> Obtain reports from management, including the Company's Chief Compliance Officer and/or the Company's counsel regarding the Company's compliance with applicable legal requirements and the Company's Code of Ethics and Business Conduct.

**Additional Duties of the Governance and Nominating Committee Defendants**

36.     In addition to the above duties, under the Governance and Nominating Committee Charter in effect since October 2003, the Governance and Nominating Committee Defendants, defendants Henney, , Long, McGee, Gochnauer, Conant, and Hagenlocker, owed specific duties to AmerisourceBergen to assist the Board in "exercise[ing] general oversight with respect to governance of the Board[.]"   Moreover the Governance and Nominating Committee's Charter provides that the Governance and Nominating Committee must:

> 2. Review and make corporate governance recommendations to the Board, including to:
>
>> a. Annually review and consider whether to recommend, for adoption by the Board, any changes to the Corporate Governance Principles, including

as needed for compliance with applicable laws, regulations and NYSE listing standards.

\* \* \*

d. Review all proposals submitted by stockholders for inclusion in the Company's annual proxy statement and results of stockholder advisory votes and recommend to the Board how to respond to such proposals and advisory votes.

e. Identify and discuss with management the risks, if any, relating to the Company's corporate governance structure and practices.

f. Review trends and issues related to corporate governance and related matters.

**Breaches of Duties**

37.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of AmerisourceBergen, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

38.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices that caused AmerisourceBergen to incur substantial damage.

39.     The Individual Defendants, because of their positions of control and authority as officers or directors of AmerisourceBergen, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, AmerisourceBergen has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

41.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) unlawfully fill facially suspicious opioid orders; (ii) fail to report the suspicious orders as required by federal and state controlled substances laws; and (iii) enhance the Individual Defendants' executive and directorial positions at AmerisourceBergen and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise, or common course of conduct.  During this time, the Individual Defendants caused the Company to unlawfully fill suspicious opioid orders and fail to report the suspicious orders to the proper authorities.

43.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

44.    The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly engage in violations of controlled substances laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

45.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**THE REGULATORY FRAMEWORK GOVERNING OPIOID DISTRIBUTION**

**Congress Enacts the Controlled Substances Act to Address Drug Abuse in the United States**

46.    In 1971, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970 and its implementing regulations (collectively, the "Controlled Substances Act" or "CSA") establishing U.S. federal drug policy designed to regulate the manufacture, distribution, importation, and use of certain substances.  The CSA established schedules for controlled substances, ranging from Schedule I to Schedule V, based on a number of different factors.  For example, controlled substances classified as Schedule I: (i) have a high potential for abuse; (ii) lack a currently accepted medical use in treatment in the United States; and (iii) lack accepted safety for use of the drug or other substance under medical supervision.  Controlled substances classified as Schedule II have a high potential for abuse and may lead to severe psychological or physical dependence, if abused.

47.     The CSA directed that the DEA determine quotas for each basic class of Schedule I and II controlled substances each year.  The CSA intended the quota system to reduce or eliminate diversion by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."  When evaluating production quotas, the CSA instructed the DEA to consider the following information:

- Information provided by the Department of Health and Human Services[];

- Total net disposal of the basic class [of each drug] by all manufacturers;

- Trends in the national rate of net disposal of the basic class [of drug];

- An applicant's production cycle and current inventory position;

- Total actual or estimated inventories of the class [of drug] and of all substances manufactured from the class and trends in inventory accumulation; and

- Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and stability issues; potential disruptions to production; and unforeseen emergencies.

**Background of the Rise of Prescription Opioids in the United States**

48.     Prescription opioids are powerful pain-reducing medications that include non-synthetic, partially-synthetic, and fully-synthetic derivatives of the opium poppy plant.  While these drugs can have benefits when used properly, they also pose serious risks.  Most patients receiving more than a few weeks of opioid therapy will experience withdrawal symptoms that are often prolonged if opioid use is delayed or discontinued.  When using opioids continuously, patients grow tolerant to their analgesic effects (the pain relief) and require progressively higher doses that increases the risks of withdrawal, addiction, and overdose.  Due to their high potential for abuse and potential to cause severe psychological and physiological dependence, opioids are categorized as "Schedule II Controlled Substances."

- 21 -

49.     Recognizing these dangers, the medical community has historically prescribed opioids only for short-term acute pain—where brief use limited the need for escalating doses and the risk of addiction was minimal—and for terminal illnesses and end-of-life care.  As a result, the market for prescription opioids was sharply constrained.  Not so today.  Today, opioids are the most prescribed class of drugs in the United States.

50.     The roots of the opioid epidemic date back to the mid-1990s when opioid developers, such as Purdue Pharma L.P., Johnson & Johnson, Teva Pharmaceutical Industries Ltd. ("Teva Pharmaceutical"), and others (collectively the "Opioid Manufacturers"), set out to enlarge the narrow opioid patient profile by reversing the traditional understanding of opioid use.  To convince medical professionals to prescribe more opioids to a broader range of patients, the Opioid Manufacturers executed massive and unprecedented marketing campaigns that minimized the risks and exaggerated the benefits associated with the long-term use of opioids to treat wide-ranging conditions, including chronic non-cancer pain.  In particular, the Opioid Manufacturers: (i) deceptively promised long-term opioid use would improve patients' function and quality of life; (ii) trivialized or obscured the serious risks and adverse outcomes, including the risk of addiction, overdose, and death, associated with opioid use; (iii) overstated the effectiveness of opioids compared with other treatments; and (iv) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms.  The Opioid Manufacturers also deceptively marketed opioids for indications and benefits that were outside of the drugs' labels.

51.     The Opioid Manufacturers' marketing and promotional efforts included, among other things, disseminating favorable "educational" materials, advertising in print materials and online, sponsoring continuing medical education courses, and hiring "key opinion leaders" to act as consultants and serve as lecturers.  These efforts were intended to increase the market for opioids

by influencing the prescribing behavior of physicians and convincing doctors to prescribe opioids for chronic non-cancer pain.

52.     The Opioid Manufacturers' deceptive marketing schemes were overwhelmingly successful, resulting in a dramatic shift in the medical and public consensus regarding the use of opioids.  Between 2000 and 2011, sales of prescription opioids in the United States quadrupled. In 2012, healthcare providers wrote 259 million prescriptions for opioid painkillers—enough to medicate every adult in America around the clock for one month.  Opioids, once a niche drug, became the most prescribed class of drugs in the United States.

**A Public Health Emergency**

53.     As should have been obvious, the rate of opioid prescription was too much.  Over the past two decades, opioid overdoses resulting from the over-prescriptions have killed more than 200,000 people.  Millions of Americans continue to suffer daily from opioid addiction.  As a result, in part, of the proliferation of opioid pharmaceuticals between the late 1990s and the present, the life expectancy for Americans has decreased for the first time in recorded history.  Drug overdoses are now the leading cause of death for Americans under fifty years old.

54.     In May 2010, the Obama administration released its inaugural National Drug Control Strategy, which stated that "[p]rescription drug abuse is the Nation's fastest-growing drug problem," and recognized that "opiate overdoses, once almost always due to heroin use, are now increasingly due to abuse of prescription painkillers."  In July 2016, Congress passed and President Obama signed the Comprehensive Addiction and Recovery Act of 2016, which authorized $181 million in additional annual funding for initiatives aimed at addressing the opioid crisis.

55.     In October 2017, President Trump declared the American opioid epidemic a public health emergency.  According to the *New York Times*, "[p]ublic health officials have called the current opioid epidemic the worst drug crisis in American history."

**The Legal Duty to Prevent Opioid Diversion**

56.     Given the destructive risks presented by opioids, Congress sought to heavily regulate the sale, marketing, and use of opioid drugs to ensure its safe distribution.  As a pharmaceutical distributor, AmerisourceBergen and its distribution centers were required to operate in accordance with the statutory provisions of the CSA.  Under these laws, Congress developed a closed distribution system to track and account for controlled substances from the manufacturer to the end consumer.  Specifically, drug manufacturers could not sell controlled substances directly to physicians or pharmacies for ultimate dispensing.  Rather, manufacturers had to use distributors, such as AmerisourceBergen, to distribute the controlled substances.  As such, the law imposed strict controls and requirements throughout the prescription opioid distribution chain, from manufacturer to end consumer.

57.     Chapters II and III of the CSA require distributors, manufacturers, and others that handle controlled substances (collectively known as "registrants"), to register with the DEA.  As registrants, they are required to: (i) limit sales within a quota set by the DEA for the overall production of Schedule II substances like opioids; (ii) maintain effective controls against diversion of the controlled substances; and (iii) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.  Registrants are duty bound to identify and report "orders of unusual size, orders deviating substantially from a normal

pattern, and orders of unusual frequency."[2]  Other red flags may include, for example, "[o]rdering the same controlled substance from multiple distributors."  Moreover, registrants' responsibilities do not end with the products they distribute or manufacture.  When registrants obtain information about the suspicious sales and distribution of other companies' opioid products, they are legally obligated to report that activity to the DEA.  Registrants that violate the CSA may be subject to DEA administrative enforcement actions or may face civil penalties or criminal prosecution by the U.S. Department of Justice.

58.     This closed-system thus imposes specific duties upon wholesale distributors to monitor, identify, halt, and report suspicious orders of controlled substances.  In other words, registrants must actively prevent drug diversion through careful oversight of suspicious orders.  All registrants of the closed distribution system must adhere to specific security, recordkeeping, monitoring, and reporting requirements that are designed to identify or prevent diversion of controlled substances.  In order to fulfill their obligations under federal and state laws, registrants are required to use highly advanced data collection and analytical systems to monitor the inventory and ordering needs of customers in real time.

59.     Failure to comply with these laws could result in the suspension or revocation by federal or state authorities of a distributor registrant's distribution centers and outsourcing facilities' licenses to distribute pharmaceutical products.  The authorities could also seize or recall the registrant's products and impose significant criminal, civil, and administrative sanctions.  Each of these results would have a significant adverse effect on the registrant's reputation, business, and results of operations.

---

[2] 21 C.F.R. §1301.74(b).

60. 

**THE COMPANY ENGAGES IN A SUPPLY CHAIN SCHEME TO UNLAWFULLY
INCREASE ITS REVENUE FROM OPIOID DISTRIBUTION**

61.     AmerisourceBergen and its subsidiaries sell and distribute a range of pharmaceutical drugs throughout the United States, including opioids. The Company distributes pharmaceuticals to a wide variety of healthcare providers, including hospitals and health systems, medical clinics, independent and chain retail pharmacies, mail order pharmacies, long-term care and alternate site pharmacies, physician practices, and other customers. The Company controls approximately one third of the total wholesale drug market. Together, with Cardinal Health, Inc. ("Cardinal Health") and McKesson Corporation ("McKesson"), these wholesaler distributors consistently account for 85% to 90% of all wholesale revenues from pharmaceuticals distributed

in the United States.  Consequently, as a pharmaceutical giant, AmerisourceBergen has profited immensely from drug distribution.  Since the mid-2000s, AmerisourceBergen's revenues from its pharmaceutical distribution segment has more than tripled, growing from approximately $50 billion in 2005 to over $172 billion in 2019.

62.    To generate these enormous profits, AmerisourceBergen engaged in a nationwide scheme to exponentially expand a market that the law intended to restrict.  In particular, the Company sold and distributed far greater quantities of prescription opioids than they knew could be necessary for legitimate medical uses.  It worked together with other pharmaceutical distributors (collectively, the "Opioid Distributors") in an illicit enterprise with the common purpose and achievement of vastly increasing their profits at the expense of the American public.

**The Company's Role in the Unlawful Opioid Distribution Scheme**

63.    Wholesale drug distributors, such as the Opioid Distributors, purchase pharmaceuticals from manufacturers and distribute the drugs to downstream customers, such as pharmacies, where they are dispensed to patients.   The Opioid Distributors acquire pharmaceuticals from manufacturers at an established wholesale acquisition cost.  Discounts and rebates from this cost may be offered by manufacturers based on market share and volume.  As a result, higher volumes may decrease the Opioid Distributors' costs per pill.  Decreased costs per pill in turn allow the Opioid Distributors to offer more competitive prices, or, alternatively, pocket the difference as additional profit.  As such, the Opioid Distributors have strong financial incentives to distribute higher volumes of opioids and to refrain from reporting or declining to fill suspicious orders.

64.    As the Opioid Manufacturers worked to increase the demand for opioids, the Opioid Distributors aggressively sought to increase the volume of opioids they sold.  They, together with

trade and industry organizations such as the Pain Care Forum and Healthcare Distribution Alliance ("HDA"), collectively engaged in the common purpose of fraudulently increasing the quotas that governed the manufacture and distribution of prescription opioids. To do so, the Opioid Distributors disseminated false and misleading information to federal and state regulators claiming that they were complying with their obligations under the CSA, including by refraining from reporting suspicious orders to the DEA. As they controlled the flow of information and influence, they called for the DEA to increase its distribution quotas for prescription opioids. With the limited information provided, the DEA had no basis for refusing to increase or decrease production quotas due to diversion. As a result, opioid production quotas, individual quotas, and procurement quotas remained artificially high.

65.    However, the Opioid Distributors are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers. Instead, they are each subject to various duties to report and monitor the quantity of Schedule II controlled substances in order to prevent oversupply and diversion into the illicit market. As registrants with the DEA, the Opioid Distributors were required to abide by their duty to combat opioid diversion, including reporting suspicious orders of controlled substances and exercising due diligence to avoid filling suspicious orders. In truth, they did not. The Opioid Distributors failed to design adequate suspicious order monitoring programs, failed to report suspicious orders to the DEA, and shipped orders that were, or should have been, flagged as suspicious. Accordingly, they failed to comply with their CSA duties.

**The Company Violates the CSA, Resulting in a 2007 Settlement Agreement with the DEA**

66.    The Company has a long history of failing its duties to combat opioid diversion under the controlled substances laws. For example, on April 24, 2007, the DEA suspended the

- 28 -

Company's license to send controlled substances from an AmerisourceBergen distribution center in Orlando, Florida.  The DEA alleged that the Company failed to maintain effective controls over shipments of prescription opioids to Internet pharmacies.  In particular, the DEA asserted that, "[i]n spite of being warned by DEA about the characteristics of rogue internet pharmacies, [the Orlando distribution center] distributed 3.8 million dosage units of hydrocodone [a common opioid] between January 1, 2006 and January 31, 2007 to [four] rogue pharmacies," and had not maintained effective controls against the diversion of hydrocodone.  AmerisourceBergen had filled numerous opioid orders for over 100 times the amount of opioids that would be expected and normal for comparably sized pharmacies.  In just thirteen months, the Company distributed large quantities of hydrocodone to the four rogue pharmacies, some of which were among its largest customers for the Orlando distribution center.

67.     On June 22, 2007, AmerisourceBergen announced that it reached an agreement with the DEA whereby the Company would implement an enhanced order monitoring program in all distribution centers by June 30, 2007 (the "2007 Settlement"), recognizing its duty to monitor sales of controlled substances and report suspicious orders to the DEA.   Under the 2007 Settlement's terms, AmerisourceBergen agreed "to maintain a compliance program designed to detect and prevent diversion of controlled substances, which shall apply to the Orlando Facility and all other existing and future distribution centers of AmerisourceBergen in the United States and its territories and possessions, which AmerisourceBergen shall revise as appropriate."  The Company also agreed to "a more rigorous examination process" for new customers.  Further, the 2007 Settlement required the Company to "inform DEA of suspicious orders as required by 21 C.F.R. §1301.74(b) in a format mutually and reasonably agreed upon by the Parties, except that

AmerisourceBergen shall inform DEA Headquarters of suspicious orders, unless and until advised otherwise in writing by DEA Headquarters."

68.     As the Company announced at the time, "[t]he new order monitoring program requires more rapid identification and daily reporting of orders that may indicate diversion of controlled substances, including in some instances, halting the shipment of orders that require further investigation by the Company."   The DEA required the Company to pass several inspections of the new program for reinstatement of the Company's license to become effective.

69.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

70.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████



71.



72.     The Company's public filings also explain that the Board plays a significant role in monitoring and enforcing compliance.  As stated in AmerisourceBergen's Proxy Statement on Form DEF 14A filed with the SEC on January 14, 2011 (the "2011 Proxy"), the "Chief Compliance Officer and/or Senior Vice President, General Counsel and Secretary report to the Audit Committee throughout the year on the status of our compliance program."  As the Proxy Statement on Form DEF 14A filed with the SEC on January 18, 2019 (the "2019 Proxy") stated, "Our Board oversees risk management and considers specific risk topics on an ongoing basis, including risks

associated with the Company's distribution of opioid medications.… Our Board of Directors actively oversees and reviews the effectiveness of our compliance programs, including our diversion control program."

73. 

**Despite the 2007 Settlement, the Company Continues Its Unlawful Opioid Distribution Practices**

74.     As revealed in a report by the U.S. Senate Homeland Security & Governmental Affairs Committee issued on July 12, 2018, the Opioid Distributors, including AmerisourceBergen, have failed in their duties to combat opioid diversion under the controlled

substances laws.  As an example, the committee report detailed the role that AmerisourceBergen, McKesson, and Cardinal Health played in fueling the opioid epidemic in the state of Missouri. The report concluded that the three companies had "consistently failed to meet their reporting obligations" regarding suspicious orders.  Between 2012 and 2017, AmerisourceBergen shipped approximately 650 million doses of opioids to Missouri, but only reported 224 suspicious orders to the DEA.  In contrast, McKesson also shipped roughly the same amount of opioids to Missouri, yet reported 16,714 suspicious orders to the DEA.  While still too low, McKesson reported approximately 75 times the amount of suspicious orders the Company reported.  Further, although Cardinal Health shipped fewer than half of the opioid doses that AmerisourceBergen shipped, Cardinal Health reported 5,125 suspicious orders over the same five-year period, or roughly 23 times more reports than AmerisourceBergen.  This data indicates, and the report concluded, that AmerisourceBergen's purported diversion control and order monitoring programs were either flawed or purposefully being ignored.

75.     The Company's flawed anti-diversion programs also played a central role in the opioid epidemic in New York, as detailed in an April 2019 amended complaint filed by the Attorney General of the state of New York against AmerisourceBergen and other Opioid Distributors and manufacturers.  The gravamen of the complaint is that "[t]he one area in which [AmerisourceBergen] has consistently stood out as compared to its major competitors is its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion."

76.     Since 2010, the Company has sold nearly 275 million oxycodone pills in the state of New York.  From 2010 to 2018, the Company distributed opioids to approximately 2,430 pharmacies in the state.  Although AmerisourceBergen purported to have effective internal

controls governing suspicious opioid distribution and reporting, some of these pharmacies demonstrated "several common indicators of suspicious activity."  Those indicators included:

- Scoring above the 90th percentile in a given New York county for opioid order volume;

- Scoring above the 90th percentile in the county for total opioid orders;

- Scoring above the 90th percentile in the county for total oxycodone orders;

- Scoring above the 90th percentile in the State of New York for the percentage of oxycodone volume shipped out of all controlled substances shipped;

- Filling prescriptions by prescribers who were later indicted or convicted on opioid-related prescribing and distribution charges;

- Scoring above the 90th percentile in terms of percentage of patient doctor-shoppers;

- Scoring above the 90th percentile in terms of percentage of cash payments; and

- Scoring above the 90th percentile in terms of the median morphine milligram equivalent prescribed per day.

77.     The indicators demonstrate that the Company's mission critical compliance programs were largely defective and inconsistent.  In truth, AmerisourceBergen operated with flawed compliance policies from the point of initial new customer onboarding.  For example, the Company required new customers to undergo an onboarding process that generally included a questionnaire (the "Form 590"), a site visit, license verification, and online due diligence investigation.  The Form 590 asked for information about the customer's other distributors, usage numbers for specific high-risk drugs, and top prescribing physicians of opioids.  However, the Company failed to require new customers to provide usage reports or dispensing data, and instead relied on a self-reporting process for pharmacies that "[did] not fulfill [AmerisourceBergen's] obligation of truly knowing its customers' business practices."  In addition, the AmerisourceBergen sales representative assigned to that particular customer completed the Form 590.  This practice

created a direct conflict of interest because those responsible for acquiring new customers, and increasing sales, were put in charge of collecting information that would be used against those customers.

78.     Furthermore, the Company's flawed policies also led to inadequate due diligence investigations, despite the due diligence policy comprising two-thirds of its entire division control program.[4]  For example, the due diligence investigation process did not include simple news searches on a pharmacy's prescribing physicians when adding the pharmacy as a new customer.  A search of news sources would have revealed that several of the prescribing physicians in New York had prior convictions for unlawful drug distribution.  As another example, in 2016, the Company initiated a project purportedly designed to validate that all customers authorized to purchase controlled substances have the required due diligence documentation in file.[5]  However, one year into the project, despite having identified a significant percentage of customer files lacking the requisite due diligence, the Company had only collected information for about 10% of those files.[6]  By May 2018, the Company estimated that only 60% of the due diligence deficiencies had been remedied.[7]  Because AmerisourceBergen's diversion control program hinged on its due diligence,

---

[4] *See* Manufacturers Defendants' Opposition to Plaintiffs' Motion for Partial Summary Adjudication on Defendants' Compliance with the Controlled Substances Act 46, *In re National Prescription Opiate Litigation*, No. 17-md-02804 (N.D. Ohio Aug. 12, 2019; ECF No. 2180).

[5] *See* Exhibit 301, Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Adjudication that Defendants Did Not Comply with Their Duties Under the Federal Controlled Substances Act to Report Suspicious Opioid Orders and Not Ship Them (corrected), *In re National Prescription Opiate Litigation*, No. 17-md-2804 (N.D. Ohio Dec. 18, 2019; ECF No. 3016-1).

[6] *Id.* at Exhibit 302 (ECF No. 3015-28).

[7] *Id.*

and the due diligence files missed key information for a substantial amount of its customers, the diversion control program operated as a complete failure.

79.     AmerisourceBergen's careless reporting procedures "allowed for frequent threshold manipulation to avoid orders being held for review, rejected from shipment, or reported as suspicious."  Its order monitoring program "uses a complex, automated approach that, in essence, *increases ordering flexibility for its customers rather than limits it*" in a manner that did not "fulfill [AmerisourceBergen's] obligations under [New York law]."  The Company's programs failed to identify "even orders of interest, much less suspicious orders."  Examples of the frequent threshold manipulation include:

- In and around 2011, thresholds were set at 300% over the average purchasing for similar sized pharmacies, ensuring that thresholds were only hit for orders that were far from the norm;

- Prior to 2012, Amerisource policy allowed a customer to have multiple Amerisource accounts associated with the same DEA number, each with its own corresponding threshold;

- During the same time period, customers had visibility of where their ordering stood against their threshold; armed with such information, they were free to order exactly to their limit, preemptively request an increase, and/or purchase those products from another provider[.]

80.     The New York Attorney General also described AmerisourceBergen's extreme reluctance to flag suspicious orders.  When an order is flagged for review, AmerisourceBergen's "Diversion Control Team can make three possible adjudications: (1) reject the order and report it as suspicious to the DEA; (2) reject as an administrative error; or (3) release and process the order."  For AmerisourceBergen, "only a small percentage of orders flagged for review are cancelled, and even fewer are deemed suspicious."  This is because the Company "has a high tolerance for compliance issues before it will terminate a customer," and "a regular practice of releasing and not reporting orders, even for customers that repeatedly and significantly exceed its established

parameters." The Company utilized "high benchmarks" for high-risk drug usage numbers before considering them red flags.

81.     AmerisourceBergen even continued to supply pharmacies in New York that exhibited red flags, such as a high amount of cash payments, a high amount of total opioid orders, and "doctor-shopper" activity.  Some of these pharmacies had 50 to 90 percent of their prescriptions filled by doctors who were indicted or convicted for illegally pushing opioids.  Still, the Company failed to properly monitor or report the suspicious orders coming from these pharmacies.  The New York Attorney General detailed three exemplar pharmacies in the state who were customers of AmerisourceBergen as examples of the Company's defective diversion control and order monitoring programs:

- **Amerisource Exemplar Pharmacy 1**, located in Orange County (about 300,000 people), was consistently at or above both the 99th percentile in the State in terms of both number of opioid orders and total opioid weight.  Between 2014 and 2016, more than 10% of its prescriptions were written by prescribers who were later indicted or convicted of opioid-related prescribing and distribution charges.  And while Amerisource reported [REDACTED] SORs for this pharmacy in 2013 and [REDACTED] in 2014, that number dwindled to [REDACTED] over the next three years, and as of 2018, Amerisource was still serving as this pharmacy's primary opioid distributor.
  *     *     *

- **Amerisource Exemplar Pharmacy 2**, located in Queens County, is a customer of Amerisource's Bellco Drug subdivision. Between 2013 and 2017, 77% of its prescriptions, on average, were written by prescribers who were later indicted or convicted, including Rogelio Lucas and Moshe Mirilashvili. In 2014 specifically, 90% of prescriptions filled by this pharmacy were made by prescribers who were later indicted or convicted. Amerisource appears to have only stopped shipping in 2017—Amerisource itself only identified [REDACTED] SORs for this pharmacy between 2013 and 2017.

  *     *     *

- **Amerisource Exemplar Pharmacy 3**, located in Bronx County, exceeded the 95th percentile for the percentage of oxycodone volume shipped for five years straight (2012 to 2016). On average, 58% of its opioid prescriptions were paid in cash (99th percentile in the State). For three consecutive years (2013 to 2015), approximately half of all opioid scripts were filled by prescribers who were later

convicted, including Robert Terdiman and Rogelio Lucas. Amerisource reported [REDACTED] SORs in 2010 and [REDACTED]. As of 2018, this pharmacy was still a customer of Amerisource.

82.     Even when pharmacies "were restricted, blocked, or terminated, [AmerisourceBergen's] system failed to ensure their accounts were de-activated."  This system deficiency enabled pharmacies on the Company's "Do Not Ship" list to continue ordering and receiving opioids.  After the control deficiency was discovered, the Company reinstated those customers without conducting any additional due diligence review.

83.     Despite knowing of the broad failures with its compliance program—including numerous instances in which those failures led to improper opioid distribution in New York and other states—the Company "never reported any of that information to the State as it was required to by the [New York Controlled Substances Act]."

84.     The wrongdoing described above are some of a multitude of examples of the Company's complete failure to monitor and report suspicious orders, extending to other states, cities, counties, municipalities, tribal authorities, and individuals affected by the opioid epidemic.

**THE INDIVIDUAL DEFENDANTS OBTAINED INFORMATION THAT INFORMED THEM OF THE COMPANY'S NON-COMPLIANCE WITH CONTROLLED SUBSTANCES LAWS**

85.     From 2007 through 2019, the Individual Defendants obtained information that warned them that AmerisourceBergen was continuously failing in its opioid diversion and reporting obligations under the controlled substance laws.  They were first advised of these serious issues from the 2007 Settlement with the DEA concerning the Company's violations of controlled substances laws, and a 2007 acquisition of a distribution company known to have violated DEA requirements. ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

86.     Despite their knowledge, the Individual Defendants failed to satisfy their mission critical duties to maintain oversight and effective controls over the Company's controlled substances distribution.   Specifically, as they collected information about the piling lawsuits, government investigations, potential flaws in the compliance programs, and even stockholder requests for improvement, they failed to act in the face of such information.   ███████████

████████████████████████████████████████████████████████

███████████████████████   This failure has consistently harmed the Company.

**The Company's 2007 Settlement with the DEA Reveals Knowledge of and Reckless Disregard for Unlawful Opioid Distribution**

87.     The Individual Defendants have known about AmerisourceBergen's violations of the controlled substances laws since the 2007 Settlement with the DEA.   Current Director Defendants Henney, Long, and McGee were members of the Board at the time of the 2007 Settlement, while defendant Collis was then-Executive Vice President and President of subsidiary AmerisourceBergen Specialty Group.   On November 28, 2007, the Company filed its Annual Report on Form 10-K with the SEC for the period ended September 30, 2007 (the "2007 Form 10-K").   The 2007 Form 10-K disclosed the Company's settlement agreement with the DEA and the reinstatement of the Orlando distribution center's license.   Defendants Henney, Long, McGee, Cotros, Gozon, and Hagenlocker each signed the 2007 Form 10-K.

88.     AmerisourceBergen's subsequent Annual Reports on Forms 10-K for 2008 through 2011 each included a disclosure referencing the 2007 Settlement.   The disclosure stated that the Company "expect[ed] to continue to comply with all of the DEA's requirements," suggesting that AmerisourceBergen was in compliance with its obligations under the 2007 Settlement.   The 2008 and 2009 Forms 10-K were signed by defendants Gochnauer, Henney, Long, McGee, Cotros,

Gozon, and Hagenlocker.  The Annual Reports on Forms 10-K for 2010 and 2011 were signed by defendants Gochnauer, Henney, Hyle, Long, McGee, Cotros, Gozon, and Hagenlocker.

89.     Furthermore, as described herein, the Company implemented a new compliance program as a result of the terms of the 2007 Settlement.  Under its terms, AmerisourceBergen "agree[d] to maintain a compliance program designed to detect and prevent diversion of controlled substances, which shall apply to the Orlando Facility and all other existing and future distribution centers of AmerisourceBergen in the United States and its territories and possessions, which AmerisourceBergen shall revise as appropriate."

90.     As described herein, the Company's public filings explain that the Board plays a significant role in monitoring and enforcing compliance.  As stated in AmerisourceBergen's 2011 Proxy, the "Chief Compliance Officer and/or Senior Vice President, General Counsel and Secretary report to the Audit Committee throughout the year on the status of our compliance program."  As the 2019 Proxy stated, "Our Board oversees risk management and considers specific risk topics on an ongoing basis, including risks associated with the Company's distribution of opioid medications…. Our Board of Directors actively oversees and reviews the effectiveness of our compliance programs, including our diversion control program."  The Compliance and Risk Committee Charter corroborates these statements by requiring that the Compliance and Risk Committee review "at least quarterly reports received from the Company's Chief Compliance Officer, counsel and other members of management regarding the Company's compliance with applicable legal requirements, including requirements of the [DEA]."

**The Bellco Acquisition Alerts Defendants to Their Compliance Obligations**

91.     The Board was also fully apprised of the critical nature of compliance with the CSA's anti-diversion provisions as a result of the Board's involvement in AmerisourceBergen's acquisition of Bellco Health ("Bellco").  Bellco was a privately held pharmaceutical distributor with annual revenues of approximately $2 billion when the Company acquired it in October 2007.  At the time of the negotiation of the acquisition, the DEA filed a federal lawsuit against Bellco for violation of the CSA due to Bellco's complete failure to maintain anti-diversion controls on controlled substances.  Though it had filled over 2,300 highly suspicious orders in the New York Metropolitan area, Bellco had not reported a single suspicious order to the DEA.  As a result, Bellco agreed to an $800,000 fine and a consent judgment suspending its license to distribute controlled substances.  *United States v. Bellco Drug Corp.*, No. 2:07-cv-02606 (E.D.N.Y. June 27,

2007).  With the announcement of Bellco's failure to maintain reasonably effective anti-diversion controls and the legal consequences thereof, the Company renegotiated the acquisition at an approximately 20% discount.

92.    The 2007 Form 10-K disclosed the Bellco acquisition, as well as Bellco's prior suspension, order to show cause, and consent judgment with the DEA.  AmerisourceBergen's subsequent Annual Reports on Forms 10-K for 2008 through 2011 each included similar disclosures.

93.    Thus, as early as 2007, the Board was aware of the critical nature of compliance with the controlled substances laws.  Specifically, the Board was fully apprised of the Company's requirements under the 2007 Settlement, the impact that a lack of adequate anti-diversion controls had on Bellco's valuation, and the Company's obligations under the CSA and equivalent state laws for stringent monitoring, controls, and oversight of opioid distribution to prevent future violations.

**The Government Opens Investigations into the Company's Distribution Practices in 2012**

94.    Despite the known prior distribution and reporting violations, the Company continued to violate the controlled substances laws.  Beginning in 2012, the DEA and several U.S. Attorney's Offices began investigating the Company's distribution operations once again, including its diversion control and order monitoring programs.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

95.    On May 4, 2012, AmerisourceBergen received a subpoena from both the U.S. Attorney's Office ("USAO") for the District of New Jersey and the DEA in connection with a grand jury proceeding.   The USAO requested documents concerning the Company's program for

controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific, and industrial purposes.   The USAO also sought information regarding specific customers' purchases of controlled substances.     The Company contemporaneously received a similar subpoena from the DEA in connection with the possible CSA violations.   The Company disclosed the subpoenas in its Annual Report on Form 10-K for 2012 (signed by defendants Collis, Cotros, Gochnauer, Gozon, Hagenlocker, Henney, Hyle, Long, and McGee), Annual Report on Form 10-K for 2013 (signed by defendants Collis, Gozon, Conant, Gochnauer, Greenberg, Hagenlocker, Henney, Hyle, Long, and McGee), Annual Report on Form 10-K for 2014 (signed by defendants Collis, Conant, Gozon, Gochnauer, Greenberg, Hagenlocker, Henney, Hyle, Long, and McGee), Annual Report on Form 10-K for 2015 (signed by defendants Collis, Barra, Conant, Durcan, Gochnauer, Gozon, Greenberg, Henney, Hyle, Long, and McGee), Annual Report on Form 10-K for 2016 (signed by defendants Collis, Barra, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee), Annual Report on Form 10-K for 2017 (signed by defendants Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee), Annual Report on Form 10-K for 2018 (signed by defendants Collis, Conant, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee), and Annual Report on Form 10-K for 2019 (signed by defendants Collis, Durcan, Gochnauer, Greenberg, Henney, Hyle, Long, and McGee).

96.   ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████  ███  ██████████  ████  ████████  ████████  ████  ██████████  █████████████

███████████████████████████████████████████

██████████████████████████

**The State of West Virginia Sues the Company over Suspicious Order Monitoring and Distribution**

97.     On June 26, 2012, the Attorney General of the state of West Virginia filed a complaint against the Company alleging that it knowingly violated the law by failing to investigate, report, and cease fulfilling suspicious prescriptions in the state.  Specifically, the Company shipped increasing amounts of opioids without sufficient monitoring or controls, facilitating six-fold increases in opioid consumption in some counties.  AmerisourceBergen was part of a drug supply chain that included doctors who wrote prescriptions for non-medical purposes and "pill mill" pharmacies that dispensed excessive numbers of painkillers.

98.     As later revealed in a December 2018 report by the U.S. House Committee on Energy and Commerce (the "House Committee"), titled "*Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia*," the Company "failed to address suspicious order monitoring" in West Virginia.  The report concluded that, although the Company had initially identified and halted suspicious orders from West Virginia immediately following the 2007 Settlement, its suspicious order reports declined significantly since 2013, eventually reaching nominal levels.

99.     Specifically, AmerisourceBergen had shipped nearly 250 million doses of the opioids hydrocodone and oxycodone to West Virginia pharmacies between 2005 and 2016.  This many doses was enough to supply every West Virginian with thirteen pain pills a year.  Yet, during this time, the Company reported a high of only 792 suspicious orders in 2013 and a low of just three suspicious orders in 2016 in the state.  Alarmingly, on a per-capita basis in 2017, "West

Virginia had the **second highest** number of suspicious orders reported to the DEA by AmerisourceBergen of **all** states": five.

| Suspicious Order Reports Submitted by AmerisourceBergen to the DEA[988] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 2007* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 0 | 6 | 18 | 60 | 47 | 178 | 311 | 792 | 545 | 53 | 3 | 5 |
| Number (in Millions) of Oxycodone and Hydrocodone Doses Shipped to West Virginia[989] | | | | | | | | | | | |
| 18.02 | 20.34 | 22.34 | 24.03 | 16.8 | 19.94 | 21.8 | 20.16 | 19.89 | 15.85 | 11.51 | --- |

\* AmerisourceBergen began to report and block suspicious orders in July 2007, thus, the number of suspicious orders reported in 2007 represents a partial year.

100.    The House Committee report also revealed changes in *how* AmerisourceBergen responded to pharmacies that placed suspicious orders in West Virginia.  A case study showed that the Company ignored serious red flags from information it obtained regarding prescribing physicians in the state.  For example, AmerisourceBergen's due diligence documents for a pharmacy called "Westside Pharmacy" included a list of six "Pain Doctors."  "Two of the doctors were located a four-hour and eleven-and-a-half-hour round-trip drive from the pharmacy respectively.  Five of the six doctors have either been subsequently convicted of, or indicted on, criminal charges related to their controlled substance prescribing, or are currently under federal investigation."  As the report stated, AmerisourceBergen failed to investigate why Westside Pharmacy filled prescriptions for physicians located hours away from the pharmacy.

101.    AmerisourceBergen told the House Committee that it placed stricter limits on Westside Pharmacy's purchasing of controlled substances in late 2012.  The House Committee, however, received no documents that reference these limitations.  Further, despite the Company's statement that Westside Pharmacy voluntarily terminated its relationship with AmerisourceBergen in 2012, the House Committee received no documents with information to that effect.

AmerisourceBergen began doing business with Westside Pharmacy again in 2016, but the documents produced to the House Committee gave no indication that AmerisourceBergen considered its own 2012 decision to place stricter limits on the pharmacy's ability to purchase controlled substances.  Moreover, prior to the customer onboarding of Westside Pharmacy in 2016, AmerisourceBergen failed to "have consulted public news reports that would have alerted the company to red flags related to some of the pharmacy's top prescribing physicians."  As the Company admitted, "[n]ews searches for prescribing physicians are not a standard part of [AmerisourceBergen's] new customer review[.]"

102.    Defendants Collis, Gochnauer, Henney, Hyle, Long, and McGee were on the Board at the time of the filing of West Virginia's lawsuit.  AmerisourceBergen disclosed the West Virginia action in its Annual Report on Form 10-K for 2012.  Thus, these defendants were aware as early as 2012 that the Company had failed to put in place an adequate anti-diversion program during the decade since the 2007 Settlement with the DEA.  AmerisourceBergen continued to disclose the West Virginia action in each of its Annual Reports on Forms 10-K through 2019.

**The Company Enters into a Distribution Agreement in 2013 with Walgreens, a Known CSA Offender, and Alliance Boots**

103.    On March 18, 2013, the Company announced that it entered into a distribution agreement with Walgreens Co. ("Walgreens") and Alliance Boots GmBH ("Alliance Boots"). ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

104.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████   ██████████   ████████████

████████████████████████████████████████████████████████

████████████████████████████████   The $80 million fine, the largest in DEA

history at the time, resolved allegations that Walgreens committed an unprecedented number of

violations under the CSA.  As part of the settlement, Walgreens admitted that it failed to uphold

its obligations as a DEA registrant.  Walgreens also agreed to enhance its training and compliance

programs.[8]

105.   ████████████████████████████████████████

████████████████████████████   ██████████   ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[8] Walgreens' problems with opioid diversion has persisted through today as the pharmacy "continued to send pills to stores 'without limit or review.'"  Jenn Abelson et al., *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Washington Post, Nov. 7, 2019), https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/?arc404=true.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

106.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████

107.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

**The Government Investigations Escalate**

108.    On August 30, 2013, the Company received a second subpoena from the New Jersey USAO requesting additional information, including information regarding specific customers' purchases of controlled substances.  The New Jersey USAO issued a third related subpoena on December 31, 2013 regarding the Company's electronically stored information. AmerisourceBergen disclosed the additional subpoenas in its Annual Reports on Forms 10-K for 2013 through 2019.

109.    Also in 2013, the Company received similar subpoenas from two more USAOs in the District of Kansas and the Northern District of Ohio.  Both subpoenas sought documents

regarding the Company's program for controlling and monitoring diversion of controlled substances and specific customers' purchases of controlled substances. AmerisourceBergen disclosed the additional subpoenas in its Annual Reports on Forms 10-K for 2013 through 2019.

110. ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████  ████████████  ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

111. The lawsuit and government investigations continued over the next few years, ███

███████████████████████████████████████  In 2014, the Company received two additional subpoenas from the New Jersey USAO, as well as additional subpoenas from the District of Kansas and Northern District of Ohio USAOs related to AmerisourceBergen's anti-diversion and monitoring programs for controlled substances. ██

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████  ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███  ██  ████  ██ ██  ████  █████  █████  ████  ██  ██████  ████

████████████  In July 2017, the New Jersey USAO and the DEA served additional subpoenas requesting documents relating to the Company's diversion control programs "from 2013 to the present."  In September 2017, the Company received a request for documents and information on behalf of forty-one Attorneys General from a coalition of states who are investigating AmerisourceBergen's distribution of prescription opioid pain medication.  AmerisourceBergen disclosed the additional subpoenas in its Annual Reports on Forms 10-K for 2014 through 2019.

112.    The subpoenas and ongoing litigation should have placed the Company's opioid distribution practices front and center.  ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

113.    ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████  ████████████████████████

██████████  █████████████████████████████████████████

███████████████████████████████████████████████████████



114.　████████████████████████████████████████████████████

████████████████

**The Company Settles with West Virginia**

115.　On January 9, 2017, AmerisourceBergen settled the allegations in the West Virginia action, paying the state of West Virginia $16 million.  In addition to the monetary settlement, AmerisourceBergen agreed to adhere to stricter reporting guidelines within West Virginia.  The settlement money would go to drug treatment programs that help West Virginians addicted to opioid drugs recover.  AmerisourceBergen disclosed the settlement in its Annual Reports on Forms 10-K for 2017 through 2019.

████████████████████████████████████████

116.　████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████   ██   ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████   ████████████████████████████████

████

117.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ ██ ███████ ██ ██ ██████ ████ █ ██ ████ ███████ █ ██████ ████ ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████
██████████████████████████████████

118.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████   ██████████████   ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██ ██ ██ █████ ████ ████████ ██ █████ █████ ██ ████

████████ ██████ ███ █████ █████ ██████ █████ █████ ██

██████████████

119.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████   As the report revealed, rather than abide by its non-delegable

duties to comply with the CSA or focus its efforts on more effectively controlling the distribution

of opioids, the Company lobbied Congress to pass legislation that would strip the DEA of its ability

to effectively regulate the Opioid Distributors.  The Company, individually and collectively

through trade and industry groups, pressured the U.S. Department of Justice to "halt" prosecutions

and lobbied Congress to remove the DEA's power to immediately suspend distributor registrations.

120.     Specifically, AmerisourceBergen spent millions lobbying Congress to pass the

"Ensuring Patient Access and Effective Drug Enforcement Act," ("EPAEDEA"), which it did in

2016.  The Act permits registrants (such as AmerisourceBergen) to submit a "corrective action

plan" that the DEA must consider in situations where it serves an order to show cause why a registrant's registration should not be denied, revoked, or suspended.  *See* 21 U.S.C. §824(c).

121.    The DEA's chief administrative law judge, John J. Mulrooney II, wrote that this provision "is akin to a state legislature mandating that law enforcement authorities allow shoplifting suspects caught in the act to outline how they intend to replace purloined items on store shelves; allow intoxicated drivers to pull to the side of the road and park their previously swerving vehicles; or perhaps allow bank robbers to round up and return ink-stained money and agree not to rob any more banks – all before any of those wrongdoers actually admit fault and without any consequence that might deter such behavior in the future."

122.    EPAEDEA also reduced the Attorney General's discretion to "suspend any registration simultaneously" with the initiation of revocation hearings, where there is an "imminent danger to the public health or safety."  The phrase "imminent danger to the public health or safety" is statutorily defined to mean there is "a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration."  21 U.S.C. §824(d).  According to Judge Mulrooney, "it is all but logically impossible, due to the obvious attenuation between the distributor or manufacturer registrant and the potential victims, to make the requisite showing up the production chain, in the case of a distributor or manufacturer….  If it had been the intent of Congress to completely eliminate the DEA's ability to ever impose an immediate suspension on distributors or manufacturers, it would be difficult to conceive of a more effective vehicle for achieving that goal."

123.    The October 2017 *Washington Post* and *60 Minutes* report revealed that AmerisourceBergen spent $3.8 million between 2014 and 2016 lobbying Congress to pass EPAEDEA.[9]  HDA spent an additional $3.5 million.  HDA's acting Vice Chairman is Mauch.

124.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████   ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

125.    ███████████████████████████████████████████

████████████████████████████   ████████████   ████████████

███████████████████████████████████████████████████

---

[9] Scott Higham & Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Washington Post, Oct. 15, 2017, https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/.

███████████████████████████████████████████████

████████████████████████████

**AmerisourceBergen Stockholders Attempt to Force the Board to Act**

126.   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████   ████████████████   ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

      ████████████████████████████████

      ████████████████████████████████

      ████████████████████████████████

      ████████████████████████████████

      ████████████████████████████████

      ████████████████████████████████

      ███████████████████████████████

████████████████

127.   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



128.

**The Opioid MDL**

129.    As of 2018, thousands of plaintiffs filed lawsuits against the Company and other pharmaceutical distributors and manufacturers in connection with the opioid crisis.  These actions generally allege damages caused, in part, by AmerisourceBergen's violations of controlled substance laws in distributing billions of doses of opioids while failing to maintain an effective anti-diversion and reporting program.  The plaintiffs seek compensation for the truly massive sums they have spent in grappling with health care and crime issues since the defendant companies began their scheme.  AmerisourceBergen and the other distributor defendants have proposed $10

billion to settle the state claims, and the state regulators countered with $45 billion.[10]   The federal

lawsuits have been consolidated for MDL in the U.S. District Court for the Northern District of

Ohio.   The Company disclosed the opioid MDL and costs of the litigation in its Annual Reports

on Forms 10-K for 2018 and 2019.



130.

131.

[10] Jef Feeley, *Opioid Distributors Propose $10 Billion to End State Claims*, Bloomberg (Aug. 6, 2019),   https://www.bloomberg.com/news/articles/2019-08-06/opioid-distributors-propose-10-billion-to-end-state-lawsuits.

132.    The Company received additional subpoenas in 2018 from the USAOs for the Eastern District of New York, the District of Colorado, the Northern District of West Virginia, the Western District of Michigan, and the Middle District of Florida.   Those subpoenas were "substantively similar to the subpoena received from the USAO-NJ in 2017."  AmerisourceBergen disclosed the above subpoenas in its Annual Reports on Forms 10-K for 2018 through 2019.

133.    On May 8, 2018, defendant Collis testified about AmerisourceBergen's role in the opioid crisis before the House Energy and Commerce Committee.  The Congressional Committee sought to further explore opioid distribution practices in West Virginia, as "the opioid epidemic continues to harm public health." ███████████████████████████████

████████████████████████████████████████████████████████

██████████  ████████  ████████  ████  ████  ██  ████  ████  ████  ██  ████████

████████████████

134.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

135.    ████████████████████████████████████████████

████████████████████████████████████████  ████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████

136. ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████

137. ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████ ████████████████████████████████████████████████

████████████████

138.    Since 2007, the Individual Defendants have engaged in a pattern of sustained and systematic failure to exercise proper oversight of the Company's compliance with controlled

substances laws.  Despite numerous investigations, lawsuits, Congressional inquiries, and calls to action by AmerisourceBergen's own stockholders, they have failed in their fiduciary duties owed to the Company.

## THE INDIVIDUAL DEFENDANTS' UNLAWFUL CONDUCT HAS SUBJECTED AMERISOURCEBERGEN TO NUMEROUS LAWSUITS AND GOVERNMENTAL INVESTIGATIONS

139.    Despite the 2007 Settlement, the Individual Defendants have continued to allow AmerisourceBergen to violate the Company's agreement with the DEA.  Furthermore, despite the awareness of the need for continued monitoring and improvement of AmerisourceBergen's anti-diversion and reporting processes for opioids, the Individual Defendants failed to ensure that such programs were effective.  As detailed herein, AmerisourceBergen distributed a multitude of suspicious orders of opioids far in excess of the needs of any specific geographic area, all while failing to report suspicious orders as required by law.  As a result of this recidivist wrongdoing, AmerisourceBergen has been the subject of numerous regulatory investigations and lawsuits.

**Governmental Investigations and Subpoenas**

140.    Since 2012, federal and state prosecutors have been investigating AmerisourceBergen's distribution of controlled substances over concerns about the Company's ineffective anti-diversion programs.[11]  For example, on May 4, 2012, AmerisourceBergen received a subpoena from both the USAO for the District of New Jersey and the DEA in connection with a grand jury proceeding.  The New Jersey USAO requested documents concerning the Company's program for controlling and monitoring diversion of controlled substances into channels other than

_____

[11] ███████████████████████████████████████████████████████████
█████████████████████████████████  In light of the information provided in the Company's Forms 10-Q and 10-K from 2012 through 2019, as described herein, the Board was kept abreast of the ongoing lawsuits and government subpoenas during that time.

for legitimate medical, scientific, and industrial purposes.  The New Jersey USAO also sought information regarding specific customers' purchases of controlled substances.  The Company contemporaneously received a similar subpoena from the DEA in connection with possible CSA violations.

141.    On August 30, 2013, the Company received a second subpoena from the New Jersey USAO requesting additional information, including information regarding specific customers' purchases of controlled substances.  The New Jersey USAO issued a third related subpoena on December 31, 2013 regarding the Company's electronically stored information.

142.    Also in 2013, the Company received similar subpoenas from two more USAOs in the District of Kansas and the Northern District of Ohio.  Both subpoenas sought documents regarding the Company's program for controlling and monitoring diversion of controlled substances and specific customers' purchases of controlled substances.

143.    The investigations continued over the next few years to today.  In 2014, the Company received two additional subpoenas from the New Jersey USAO, as well as additional subpoenas from the Kansas and Northern District of Ohio USAOs related to AmerisourceBergen's anti-diversion and monitoring programs for controlled substances.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  In July 2017, the New Jersey USAO and the DEA served additional subpoenas requesting documents relating to the Company's diversion control programs "from 2013 to the present."  In September 2017, the Company received a request for documents and information on behalf of forty-one Attorneys General from a coalition of states who are investigating AmerisourceBergen's distribution of prescription opioid pain medication.

The Company has since received similar subpoenas from the USAOs for the Eastern District of New York, the District of Colorado, the Northern District of West Virginia, the Western District of Michigan, the Middle District of Florida, the Southern District of Florida, and the Eastern District of California.

**The West Virginia Litigation**

144. On June 26, 2012, the Attorney General of the state of West Virginia filed a complaint against the Company alleging that it knowingly violated the law by failing to investigate, report, and cease fulfilling suspicious prescriptions in the state. Specifically, the Company shipped increasing amounts of opioids without sufficient monitoring or controls, facilitating six-fold increases in opioid consumption in some counties. AmerisourceBergen was part of a drug supply chain that included doctors who wrote prescriptions for non-medical purposes and "pill mill" pharmacies that dispensed excessive numbers of painkillers.

145. The Company settled the allegations on January 9, 2017, paying the state of West Virginia $16 million. The state planned to use the settlement to support drug-abuse prevention and treatment. In addition to the monetary settlement, AmerisourceBergen agreed to adhere to stricter reporting guidelines within West Virginia.

**The Opioid Multi-District Litigation**

146. As described above, thousands of plaintiffs have filed lawsuits against the Company and other pharmaceutical distributors and manufacturers in connection with the opioid crisis. These actions have been consolidated for MDL in the U.S. District Court for the Northern District of Ohio. Notably, AmerisourceBergen has already spent more than $1 billion on opioid litigation related costs.

147. On December 19, 2018, the Northern District of Ohio largely denied the defendants' motions to dismiss the operative complaint in the MDL. Discussing the adequacy of plaintiffs'

Racketeer Influenced and Corrupt Organizations Act claims, the court credited their allegations that the Company and the other defendants' "intentionally turned a blind eye to orders of opiates they knew were suspicious, thereby flooding the legitimate medical market and creating a secondary 'black' market at great profit to [d]efendants and at great cost to [p]laintiffs." Similarly, in discussing plaintiffs' negligence claims, the court found that, "taking [p]laintiffs' allegations as true, by failing to administer responsible distribution practices (many required by law), [d]efendants not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market" that plaintiffs were "responsible for combatting." The cases continue to advance.

148.    On October 21, 2019, AmerisourceBergen, along with distributors Cardinal Health and McKesson and manufacturer Teva Pharmaceutical, agreed to pay a combined $260 million settlement with two Ohio counties to avoid the first scheduled federal opioid trial. The Ohio counties' lawsuits were expected to serve as the bellwether trials for the broader MDL. The settlement, if extrapolated to a nationwide deal resolving all litigation for the four defendants, suggests a settlement value of around $48 billion, based on a court-approved allocation formula. Analysts have estimated that a global settlement for all related opioid litigation could cost as much as $100 billion.[12]

### THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S 2018 PROXY

149.    Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff

---

[12] Feeley, *supra* note 10.

specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

150.    On January 19, 2018, the Company issued its 2018 Proxy filed on Form DEF 14A with the SEC for the 2018 Annual Meeting of Stockholders, which was held on March 1, 2018.  In the 2018 Proxy, defendants Collis, Henney, Barra, Durcan, Conant, Gochnauer, Greenberg, Hyle, Long, and McGee solicited stockholder votes to, among other things: (i) reelect defendants Collis, Henney, Barra, Durcan, Conant, Gochnauer, Greenberg, Hyle, Long, and McGee to the Board, and to elect defendant Conant to the Board; and (ii) reject two stockholder proposals that proposed improved internal controls due to AmerisourceBergen's contribution to the opioid epidemic. Defendants Collis, Henney, Barra, Durcan, Conant, Gochnauer, Greenberg, Hyle, Long, and McGee negligently issued misleading statements with respect to each of these solicited votes.

**Misstatements in Support of Reelecting Defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee, and Electing Defendant Conant to the Board**

151.    In support of defendants Collis, Henney, Barra, Durcan, Conant, Gochnauer, Greenberg, Hyle, Long, and McGee's bid to reelect themselves to the Board, these defendants highlighted their risk oversight duties and responsibilities.   These responsibilities included oversight over "legal, regulatory and operational risks" to the Company, including oversight over its purportedly "sophisticated diversion control program through which the Company provides daily reports directly to the [DEA] about the quantity, type, and receiving pharmacy of every order of controlled substances we distribute."   In particular, the 2018 Proxy stated:

**How does the Board oversee our risk management process?**

The Board executes its oversight responsibility for risk management directly and through its committees, as follows:

- The Board considers specific risk topics throughout the year, including risks associated with our business plan, operational efficiency, strategic objectives, government regulation, investment opportunities, physical facilities, information technology (including cybersecurity) and capital structure, among many others. Each fiscal quarter, our Chief Financial Officer reports to the Board on AmerisourceBergen's financial performance and explains how actual performance compares to our business plan. Our corporate officers and the leaders of our principal business units report regularly to the Board about the risks and exposures related to their areas of responsibility. The Board is informed about and regularly discusses our risk profile, including legal, regulatory and operational risks to our business. The Board also oversees our compliance policies and practices, including our sophisticated diversion control program through which the Company provides daily reports directly to the Drug Enforcement Administration about the quantity, type, and receiving pharmacy of every order of controlled substances we distribute.

- Each Board committee reports to the Board at every regular Board meeting on the topics discussed and actions taken at the most recent committee meeting. The Board discusses the risks and exposures, if any, involved in the matters or recommendations of the committees, as necessary.

- Our Audit Committee has primary responsibility for monitoring our internal audit, corporate, financial and regulatory risk assessment and risk management processes and overseeing our system of internal controls and financial reporting. The Audit Committee discusses specific risk areas throughout the year, including those that may arise in various business units and the measures taken by management to monitor and limit risk. In addition, the Audit Committee oversees the development and implementation of our enterprise risk management program.

*   *   *

- The Board's other committees oversee risks associated with their respective areas of responsibility. For example, the Governance and Nominating Committee oversees our corporate governance practices generally, giving particular consideration to our role as a distributor in the pharmaceutical supply chain. Additionally, the Compensation and Succession Planning Committee assesses risks associated with our compensation policies and programs for executives as well as employees generally. Our Finance Committee discusses risks relating to our capital structure, financing activities, dividend and tax policy and share repurchase activities.

- We have a Chief Compliance Officer who oversees our corporate compliance program, including training on and monitoring compliance with our Code of Ethics and Business Conduct and the Company's reporting, investigation and corrective action program. We also have an internal Compliance Committee composed of senior executives, including our Chief Compliance Officer and

Chief Compliance Counsel, which supports the Chief Compliance Officer in fulfilling his responsibilities and driving corporate adherence to our compliance program, Code of Ethics and Business Conduct and related policies and procedures. Our Chief Compliance Officer and Chief Compliance Counsel provide reports to the Audit Committee and the full Board throughout the year on corporate compliance matters, the status of our compliance programs (including our diversion control program described above), calls to our hotline and any other material developments.

152.    In addition, the 2018 Proxy highlighted the Company's purported Corporate Governance Principles and Code.  In particular, the 2018 Proxy stated:

Our Board has adopted our corporate governance principles. Together with the charters of the Board committees, they provide the framework for the governance of AmerisourceBergen. Our corporate governance principles clearly delineate the authority and roles of the Chairman of the Board and the Lead Independent Director in the leadership of the Board, mandate the independence of the committee Chairs and all the members of our audit, compensation and governance committees, and affirm non-employee directors' access to managers and associates outside the presence of our executives.

\*   \*   \*

**Code of Ethics**

\*   \*   \*

The Board of Directors adopted our Code of Ethics and Business Conduct in May 2004. We review and revise the Code of Ethics and Business Conduct from time to time, most recently in March 2017. It applies to directors and employees, including officers, and is intended to comply with the requirements of Section 303A.10 of the NYSE Listed Company Manual.

\*   \*   \*

We have adopted our Code of Ethics for Designated Senior Officers in accordance with Item 406 of the SEC's Regulation S-K.  It applies to our President and Chief Executive Officer, Executive Vice President and Chief Financial Officer and Senior Vice President and Corporate Controller.

153.    The 2018 Proxy thus assured stockholders that the Board abided by AmerisourceBergen's Corporate Governance Principles and Code, and actively monitored the Company's risks and internal controls.   In truth, the 2018 Proxy was materially false and

misleading because the Board utterly failed in its oversight duties by allowing the Company to flood the market with illicit opioids and operate with inadequate internal controls.  As detailed herein, the Board failed to execute its oversight responsibility for risk management over the Company.  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  Thus, the 2018 Proxy was misleading.

154.    The 2018 Proxy harmed AmerisourceBergen by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.  As a result of the misleading statements therein, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Collis, Henney, Barra, Durcan, Conant, Gochnauer, Greenberg, Hyle, Long, and McGee to the Board.

**Misstatements in Opposition to Adopting Policies to Require the Company to Operate with Improved Internal Controls**

155.    The 2018 Proxy contained a stockholder proposal, Proposal 5, submitted to the Company for action at the 2018 Annual Meeting.  Under Proposal 5, stockholders urged the Board to adopt a policy wherein the Chairman of the Board shall be an independent director who has not previously served as an executive officer of the Company.  In particular, the 2018 Proxy Proposal 5 stated:

> Shareholders of AmerisourceBergen Corp., ("the Company" or "AmerisourceBergen"), urge the Board of Directors (the "Board") to take the steps necessary to adopt a policy, with amendments to governing documents as needed, so that, to the extent feasible, the Chairman of the Board shall be an independent director who has not previously served as an executive officer of the Company. The policy should be implemented so as not to violate any contractual obligations and should specify the process for selecting a new independent chairman if the

chairman ceases to be independent between annual meetings of shareholders or if no independent director is available and willing to serve as chairman.

156.    In support of Proposal 5, the stockholders cited to the Board's duty to "provide rigorous oversight of management to protect the interests of the Company and shareholders. This oversight may be weakened if the chairman is also the chief executive officer-as at AmerisourceBergen-or is otherwise not independent from management." According to Proposal 5, such considerations are "especially critical at AmerisourceBergen given the potential reputational, legal and regulatory risks AmerisourceBergen faces over its role in the nation's opioid epidemic." In particular, Proposal 5 stated:

> The Board's role, led by its chairman, is to provide rigorous oversight of management to protect the interests of the Company and shareholders. This oversight may be weakened if the chairman is also the chief executive officer-as at AmerisourceBergen-or is otherwise not independent from management. Even with robust responsibilities, the lead independent director's position is inadequate to this task because ultimate responsibility for board leadership remains with the chairman/CEO. An independent chairman can best facilitate effective deliberation of strategy, risk oversight and management accountability.

> These considerations are especially critical at AmerisourceBergen given the potential reputational, legal and regulatory risks AmerisourceBergen faces over its role in the nation's opioid epidemic. According to the Centers for Disease Control, prescription opioids claim 62 lives a day in this country.

> According to a Pulitzer prize-winning review of the Drug Enforcement Administration drug shipping sales by The Charleston Gazette-Mail, AmerisourceBergen supplied over 132 million hydrocodone and oxycodone pills between 2007 and 2012 to West Virginian pharmacies, enough to supply approximately 72 pills for every adult and child in the state.

> In January 2017, AmerisourceBergen agreed to pay $16 million to settle a lawsuit from the State of West Virginia alleging AmerisourceBergen violated the law in failing to investigate, report, and cease fulfilling suspicious prescriptions in the state. As of July 2017, lawsuits had been filed by a number of West Virginia counties and municipalities alleging similar actions.

> In May 2017, The U.S. House Energy and Commerce Committee began examining alleged pill dumping in West Virginia and the potential role played by AmerisourceBergen and other large drug distributors.

In April 2017, The Washington Post reported AmerisourceBergen was one of the pharmaceutical industry companies being sued by the Cherokee Nation in tribal court for failing to prevent the diversion of pain pills. The lawsuit states in 2015, enough prescription opioids were distributed in the Cherokee Nation for 955-5 mg. dose pills per adult and child.

In the midst of such scrutiny, an independent chairman is invaluable in providing robust oversight of management and ensuring good communications and credibility with stakeholders.

157.    The Board recommended that stockholders vote *against* Proposal 5.  According to the Board's statements in the 2018 Proxy, "[the Company's] stockholders benefit most when the Board has the ability to determine the leadership structure that best serves the stockholders' interests."  Further, the Board "believes that there is already substantial oversight of management," and that the "Board is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse."  In particular, supplying the Board's reasoning for stockholders to vote against Proposal 5, the 2018 Proxy stated:

**The Board is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse.**

As a pharmaceutical distributor, we facilitate a safe and secure supply chain for the distribution of a broad range of pharmaceutical medications, including opioids. As part of our compliance program, we have a sophisticated diversion control program through which we provide daily reports directly to the Drug Enforcement Administration about the quantity, type and receiving pharmacy of every order of controlled substances we distribute. Through this program, we seek to minimize diversion in the supply chain by cancelling orders that are identified as suspicious and reporting them to the Drug Enforcement Administration, while ensuring access to these prescription medications to patients with legitimate needs.

Our Chairman and CEO, Lead Independent Director and entire Board actively oversee and review the effectiveness of our compliance programs, including our diversion control program, and receive regular updates from the Company's management on our compliance program's guidelines, training initiatives, monitoring activities and any enforcement or corrective responses. The Board also supports management's efforts more broadly to develop meaningful solutions to the opioid epidemic, which the Board understands will require close collaboration with

doctors, pharmacies, manufacturers, policy makers and other stakeholders in the healthcare industry.

158.    The 2018 Proxy's statements in opposition to Proposal 5 thus assured stockholders that the Board is "actively engaged" in overseeing the Company's opioid distribution and reporting controls.  The Board repeated its claim that the Company has a "sophisticated diversion control program through which we provide daily reports" to the DEA.  In addition, the Board stated it "receive[s] regular updates … on our compliance program's guidelines, training initiatives, monitoring activities and any enforcement or corrective responses."  Moreover, the Board stated it "supports management's efforts more broadly to develop meaningful solutions to the opioid epidemic." ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ The 2018 Proxy was therefore materially false and misleading because the Board utterly failed in its oversight duties by allowing the Company to flood the market with illicit opioids and operate with inadequate internal controls.

159.    The 2018 Proxy included another stockholder proposal, Proposal 8, submitted to the Company for action at the 2018 Annual Meeting.  Under the proposal, stockholders urged the Board to report to stockholders by September 30, 2018 on the governance measures the Company has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis.  In particular, Proposal 8 stated:

> RESOLVED, that shareholders of AmerisourceBergen Corporation ("AmerisourceBergen") urge the Board of Directors (the "Board") to report to shareholders by September 30, 2018 on the governance measures AmerisourceBergen has implemented since 2012 to more effectively monitor and manage financial and reputational risks related to the opioid crisis in the U.S., given AmerisourceBergen's distribution of opioid medications, including whether AmerisourceBergen has assigned responsibility for such monitoring to the Board or one or more Board committees, revised senior executive compensation metrics

or policies, adopted or changed mechanisms for obtaining input from stakeholders, or altered policies or processes regarding company political activities.

The report should be prepared at reasonable cost and should omit confidential and proprietary information.

160.    In support of Proposal 8, the stockholders cited to the Company's recent "$16 million settlement with the Attorney General of the state of West Virginia over claims the company acted negligently by distributing controlled substances to pharmacies that serve individuals who abuse controlled substances, and failed to report suspicious orders of uncontrolled substances in accordance with state regulations."  According to the proposal, it is not clear from Board committee charters or proxy statements whether a specific Board committee monitors opioid-related financial and reputational risks.  In particular, Proposal 8 stated:

> [I]t is not clear from AmerisourceBergen's Board committee charters or proxy statement whether a specific Board committee monitors opioid-related financial and reputational risks; for example, none of the Board committees has been assigned specific responsibility for overseeing potentially opioid-related compliance matters such as DEA reporting. As well, AmerisourceBergen's most recent proxy statement asserts that individual performance is among the factors considered in granting annual equity incentive awards to named executive officers, but does not indicate whether any opioid-related objectives, such as promoting ethical conduct, were part of that performance assessment.

161.    The Board recommended that stockholders vote *against* Proposal 8.  According to the Board's statements in the 2018 Proxy, "AmerisourceBergen already has publicly disclosed controls to manage significant risks associated with the Company's business."  Further, the Board stated that it "is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse," and, as a result, "believes that the preparation of a separate report is not necessary."  In support for the Board's recommendation to vote against Proposal 8, the 2018 Proxy stated:

**The Board is actively engaged in overseeing AmerisourceBergen's efforts to help combat prescription drug abuse.**

As a pharmaceutical distributor, AmerisourceBergen facilitates a safe and secure supply chain for the distribution of a broad range of pharmaceutical medications, including opioids. As part of our compliance program, we have a sophisticated diversion control program which involves direct communications and coordination with the Drug Enforcement Administration (the "DEA"). Our entire Board, led by our Chairman and CEO and Lead Independent Director, actively oversees and reviews the effectiveness of our compliance programs. The Board also supports management's efforts more broadly to develop meaningful solutions to the opioid epidemic, which the Board understands will require close collaboration with doctors, pharmacies, manufacturers, policy makers and other stakeholders in healthcare.

AmerisourceBergen's commitment to help combat the opioid epidemic is demonstrated by our coordination across our industry with other distributors and the Healthcare Distribution Alliance and close collaboration with legislators, policy makers and regulatory agencies to continue to monitor and stop suspicious orders and minimize and deter diversion. We continue to invest millions of dollars in our best-in-class Diversion Control Team. In addition to our continued reporting and stopping of orders determined to be suspicious, we also continue to provide daily reports about the quantity, type and receiving pharmacy of every single order of controlled substances we distribute to regulatory and enforcement professionals. Additionally, along with our partner Walgreens, we have expanded the Safe Medication Disposal Kiosks take-back program and our Good Neighbor Pharmacy safe drug disposal program in conjunction with the national DEA Prescription Drug Take-Back Day. Our AmerisourceBergen Foundation is also actively working to support a broader range of grants and educational programs. AmerisourceBergen takes very seriously our role in the supply chain and our responsibility to patients-getting FDA-approved drugs from pharmaceutical companies that manufacturer them to DEA-registered pharmacies that dispense them based on prescriptions written by licensed healthcare providers. We are continuously working to identify and explore innovative ideas to combat the crisis, and have formed an internal cross-functional Opioids Task Force to help coordinate these efforts across the enterprise.

162.   The 2018 Proxy's statements in opposition to Proposal 8 thus assured stockholders that the Board is "actively engaged" in overseeing the Company's opioid distribution and reporting controls. The Board repeated its false claim that "AmerisourceBergen facilitates a safe and secure supply chain for the distribution" of opioids and has a "sophisticated diversion control program." Nor did AmerisourceBergen demonstrate its "commitment to help combat the opioid epidemic"

by its "coordination … with other distributors and the [HDA] and close collaboration with legislators, policy makers and regulatory agencies to continue to monitor and stop suspicious orders and minimize and deter diversion." ████████████████████

████████████████████████████████████████████

████████████████████████████ As described in the thousands of lawsuits brought by federal, state, and local government entities, the Company failed to "stop suspicious orders and minimize and deter diversion" on a nationwide scale.  As a result, the 2018 Proxy was materially false and misleading because the Board utterly failed in its oversight duties by allowing the Company to flood the market with illicit opioids and operate with inadequate internal controls.

163.    The above statements concerning Proposals 5 and 8 misleadingly represented that the Company conducted its business in compliance with applicable laws, including all regulations governing the Company's distribution of opioids.  The statements also misleadingly represented that AmerisourceBergen had in place policies and practices concerning social and governance issues that made the preparation of a monitoring report to stockholders unnecessary.  In truth, as detailed herein, the Company had inadequate internal controls and the Individual Defendants failed in their oversight duties to monitor the distribution of suspicious orders of opioids and report suspicious orders to the proper authorities.

164.    As a result of these misleading statements, the Company's stockholders voted against: (i) adopting a policy requiring the Chairman of the Board to be an independent director who has not previously served as an executive officer of the Company; and (ii) requiring the Board to report to stockholders on the governance measures implemented since 2012 to more effectively monitor risks related to the opioid crisis in the United States.  The Company's stockholders voted

against each of these proposals without adequate information necessary to make a reasonably informed decision.

## DAMAGES TO AMERISOURCEBERGEN

165.    The Individual Defendants' participation in the wrongdoing detailed above and failure to remedy the Company's improper business practices has exposed AmerisourceBergen to billions of dollars in liability for individual and class action lawsuits.  AmerisourceBergen has been named as a defendant in thousands of lawsuits brought by various federal, state, and local governments related to the Company's unlawful distribution of opioids.  As the Company admitted in its Annual Report on Form 10-K filed with the SEC on November 19, 2019, "an adverse judgment or negotiated resolution in any of these matters could have a material adverse effect on the Company's results of operations, consolidated financial position, cash flows or liquidity."

166.    AmerisourceBergen's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, AmerisourceBergen's current and potential customers consider a company's ability to comply with laws, rules, and regulations designed to address and decrease the opioid epidemic.  Businesses are less likely to award contracts to companies that have problems complying with the law.  AmerisourceBergen's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

167.    Further, as a direct and proximate result of the Individual Defendants' actions, AmerisourceBergen has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the opioid lawsuits and investigations brought by states, counties, municipalities, other governmental entities, and tribes in various federal, state, and other courts against the Company, including, without limitation, the MDL consolidated before the Northern District of Ohio for violations of controlled substances laws;

(b)     costs incurred from defending and paying any settlement in the 2017 action brought by the state of West Virginia for violations of controlled substances laws, including, without limitation, costs incurred from complying with and adhering to stricter reporting guidelines within West Virginia;

(c)     costs incurred in complying with the governmental investigations into the misconduct detailed herein, including any fines or penalties resulting therefrom; and

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to AmerisourceBergen.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

168.   Plaintiff brings this action derivatively in the right and for the benefit of AmerisourceBergen to redress injuries suffered, and to be suffered, by AmerisourceBergen as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  AmerisourceBergen is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

169.   Plaintiff will adequately and fairly represent the interests of AmerisourceBergen in enforcing and prosecuting its rights.

170.    Plaintiff was a stockholder of AmerisourceBergen at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current AmerisourceBergen stockholder.

171.    The current Board of AmerisourceBergen consists of the following ten individuals: defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, McGee, and non-defendant Dennis M. Nally.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

172.    As alleged above, defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2018 Proxy.  Defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee are responsible for the negligently made statements in the materially misleading 2018 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, any indemnification provided by the Company to defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee does not protect them from violations of section 14(a) in the 2018 Proxy.  As a result, these defendants face a substantial likelihood of liability, excusing demand.

173.    Furthermore, defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee breached their fiduciary duties of loyalty by abdicating their responsibility to exercise proper oversight of AmerisourceBergen.  The Director Defendants were, at all relevant times, well aware of the stringent government regulation over controlled substances distribution, the Company's DEA reporting requirements under the 2007 Settlement, and the opioid epidemic

facing the nation. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ ███████████████

███████ ██████████ ███ █ ████ █████████ ██████ ██ ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ ██████████ █████ ██ ███ █████████ ██████ ██ ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

    174. ████████████████████████████████████████████

████████████████████████████████████████████ ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



176.    In the Settlement Agreement between plaintiff and the Company regarding plaintiff's demand to inspect certain documents pursuant to title 8, section 220 of the Delaware General Corporation Law (the "Settlement Agreement"), the Company agreed to "produce responsive, non-privileged portions of the following books and records[.]"  In particular, under the Settlement Agreement, the Company agreed to produce:

    a.  Any minutes of a meeting of the Board and Directors or Audit Committee concerning ABC's diversion control program or opioid orders, if any as it relates to:

        i.  state and federal laws, rules, and regulations concerning the sale or distribution of controlled substances such as opioids, including, but not limited to, steps the Company took to comply with those laws, rules, and regulations, any failures to comply with those laws, rules, and regulations and any corrective actions taken by the Company; and

       ii.  any lawsuits and government investigations, including subpoenas from the U.S. Attorneys in the District of New Jersey, the Eastern District of New York, the District of Colorado[,] the Norther District of West Virginia, the Western District of Michigan and the DEA office in Orland [sic] Florida , and lawsuits by the West Virginia and Kentucky Attorneys General.

    b.  All books and records materials provided to the Board of Directors or Audit Committee in connection with their role as board members concerning ABC's diversion control program or opioid orders, if any, as it relates to:

     i.  state and federal laws, rules, and regulations concerning the sale or distribution of controlled substances such as opioids, including, but not limited to, steps the Company took to comply with those laws, rules, and regulations, any failures to comply with those laws, rules, and regulations and any corrective actions taken by the Company; and

    ii.  any lawsuits and government investigations, including subpoenas from the U.S. Attorneys in the District of New Jersey, the Eastern District of New York, the District of Colorado[,] the Norther District of West Virginia, the Western District of Michigan and the DEA office in Orland [sic] Florida , and lawsuits by the West Virginia and Kentucky Attorneys General.

c.  Board questionnaires from the last 3 years.

177.  ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  ████████████  ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████  ██  ████████████████████████████████████

████████████████████████████

178.  ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ Yet, for over a decade, the Company continued to have an exceedingly high rate of suspicious opioid shipments while at the same time reported relatively low suspicious orders to the DEA. ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████  ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ Accordingly, demand is excused.

179.    In addition, defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee unheeded the very responsibilities that AmerisourceBergen's own Code imposed on them.  Specifically, the Company committed to conduct its business with all applicable laws, rules, and regulations and mandated that all officers, directors, and employees exemplify "the highest level of business ethics, honesty and integrity."  In short, AmerisourceBergen's Code requires its officers, directors, and employees to obey the law.  Notwithstanding the Code's provisions, each of these defendants acquiesced to, if not participated in, the decision to continue oversupplying the market with opioids and failed to monitor and report suspicious orders to the

proper authorities. These defendants knew of the duties imposed on them but failed to act, resulting in AmerisourceBergen's massive revenues gained from the opioid distribution scheme.

180. Defendants Greenberg, Durcan, Hyle, Henney, McGee, Gochnauer, and Long, as members of the Audit Committee, were specifically charged with compliance oversight responsibilities. The Audit Committee's Charter provides that it is responsible for compliance with legal and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the Company to operate with improper controls over the distribution of opioids. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

181. In addition, defendants Greenberg, Durcan, Hyle, Henney, McGee, Gochnauer, and Long, as members of the Audit Committee, reviewed and approved the improper statements in the 2018 Proxy. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's regulatory compliance and disclosure controls. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused the improper statements in the 2018 Proxy. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

182. The principal professional occupation of defendant Collis is his employment with AmerisourceBergen, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Collis lacks independence from defendants Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and

McGee due to his interest in maintaining his executive position at AmerisourceBergen.  This lack of independence renders defendant Collis incapable of impartially considering a demand to commence and vigorously prosecute this action.  AmerisourceBergen paid defendant Collis the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2018 | $1,240,000 | $5,599,992 | $2,400,007 | $2,050,733 | $223,383 | $11,514,115 |
| 2017 | $1,240,000 | $4,199,984 | $2,799,999 | $1,339,883 | $327,408 | $9,907,274 |
| 2016 | $1,234,231 | $4,019,981 | $2,680,003 | $1,330,783 | $713,178 | $9,978,176 |
| 2015 | $1,190,000 | $4,019,982 | $2,679,998 | $2,447,342 | $463,504 | $10,800,826 |
| 2014 | $1,185,962 | $4,020,021 | $2,679,998 | $1,859,697 | $157,307 | $9,902,985 |
| 2013 | $1,155,000 | $7,710,338 | $1,675,899 | $1,314,978 | $143,991 | $12,000,206 |
| 2012 | $1,093,462 | $2,699,983 | $1,800,015 | $1,348,150 | $115,012 | $7,056,622 |

Accordingly, demand is futile as to defendant Collis.

183.    Plaintiff has not made any demand on the other stockholders of AmerisourceBergen to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    AmerisourceBergen is a publicly held company with over 205 million shares outstanding and thousands of stockholders as of October 31, 2019;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

184.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

186.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to reelect defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee to the Board, as well as reject stockholder proposals seeking internal reform related to risks presented by the opioid crisis.

187.    The 2018 Proxy, however, misrepresented and failed to disclose that the Company was engaging in a scheme to gain illicit profits through unlawful means, in direct violation of its federal and state anti-diversion and reporting obligations for distributing controlled substances.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.   As a direct and proximate result of the defendants' wrongful conduct, AmerisourceBergen misled and deceived its stockholders by making misleading statements that were essential links in stockholders heeding the Company's recommendation to approve the 2011

- 85 -

Employee Stock Purchase Plan and reelect defendants Collis, Henney, Barra, Durcan, Gochnauer, Greenberg, Hyle, Long, and McGee to the Board.

188.    Plaintiff, on behalf of AmerisourceBergen, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

189.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.    The Individual Defendants owed and owe AmerisourceBergen fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe AmerisourceBergen the highest obligation of good faith, fair dealing, loyalty, and due care.

191.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within AmerisourceBergen, or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

192.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company engaged in a scheme to proliferate the spread of opioids while failing to comply with the federal and state anti-diversion and reporting obligations for distributing controlled substances. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

193.    The Director Defendants, as directors of the Company, owed AmerisourceBergen the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly

permitting the improper activity concerning the unlawful opioid distribution scheme.  The Director Defendants knew or were reckless in not knowing that the Company engaged in a scheme to proliferate the spread of opioids while failing to comply with the federal and state anti-diversion and reporting obligations for distributing controlled substances.  Accordingly, these defendants breached their duty of loyalty to the Company.

194.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

195.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AmerisourceBergen has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

196.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

197.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.    As a result of the Individual Defendants failure to properly supervise and monitor the adequacy of the Company's order monitoring and diversion program controls and procedures, the Individual Defendants have caused AmerisourceBergen to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

199.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

201.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AmerisourceBergen.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to AmerisourceBergen.

203.    Plaintiff, as a stockholder and representative of AmerisourceBergen, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

204.    Plaintiff, on behalf of AmerisourceBergen, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of AmerisourceBergen, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing AmerisourceBergen to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AmerisourceBergen and its stockholders from a repeat of the damaging events described herein,

including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over the distribution of opioids;

2. a proposal to strengthen the Board's oversight of its diversion control and order monitoring procedures;

3. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4. a provision to permit the stockholders of AmerisourceBergen to nominate at least three candidates for election to the Board;

C. Extraordinary equitable or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of AmerisourceBergen has an effective remedy;

D. Awarding to AmerisourceBergen restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 4, 2020

**COOCH AND TAYLOR, P.A.**

_____

BLAKE A. BENNETT (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
P.O. Box 1680
Wilmington, DE 19899
(302) 984-3889

*Attorneys for Plaintiff*

**OF COUNSEL**

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
EMILY R. BISHOP
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com
        ebishop@robbinsllp.com

1412884